Argued and submitted May 18, affirmed August 10, 1981

# WALKER et al,
*Appellants,*

*v.*

# FEIRING et al,
*Respondents.*

## (No. 39 432, CA 18606)

632 P2d 1270

Richard H. Muller, Portland, argued the cause and filed the briefs for appellants.

Diane C. Brock, Portland, argued the cause for respondents. With her on the brief was Kathryn H. Clarke, Portland.

Before Joseph, Chief Judge, and Thornton and Van Hoomissen, Judges.

JOSEPH, C. J.

## JOSEPH, C. J.

Plaintiffs-sellers appeal from a decree granting specific performance of three real estate contracts. In their complaint they sought to have their title quieted, and the defendants counterclaimed for specific performance. On appeal plaintiffs raise only one issue clearly:[1] Whether, in contemporaneous multiple real estate transactions where time was agreed to be of the essence, the seller, by not insisting upon timely performance of part of the transactions, thereby waives the right to insist upon timely performance of the others. In the circumstances of this case, we find a waiver.

Plaintiffs are joint venturers engaged in building and developing a complex of multi-family units known as Rock Creek Village No. 2 (Village) in Washington County, Oregon. Defendants are real estate investors who planned to buy four-plex units in a section of the Village, hold them as apartments for one year and then, for tax purposes, convert them into condominiums prior to resale. It was important to the plan that the units be contiguous to one another. Plaintiffs were aware of the plan, and defendant Warrington testified that, in order to facilitate the eventual resale of each unit, the parties agreed to individual contracts of sale rather than a single contract covering all of them.

Defendants initially purchased three units from plaintiffs. In April, 1978, they executed earnest money agreements for the purchase of five more — on lots 22 through 26 — located contiguously to the first three. Defendants agreed to purchase lots 24, 25 and 26 from plaintiffs directly and lot 22 from a Mr. Goldberg and lot 23 from a Mr. Hauseman. Plaintiffs had notice of the latter two assignments.[2] The earnest money agreements for all

---

[1] Plaintiffs' brief violates Rule 7.17, Supreme Court and Court of Appeals Rules of Appellate Procedure, in that the statement of the case is not set forth under separate headings.

[2] William Walker testified that at the time of the transaction, he did not see Goldberg's and Hauseman's assignments as assignments:

"Well, I didn't see it that way. I didn't feel that it was that way, no. He [defendant Warrington] would be the end owner, yes. Eventually, he would own them, but he had to pay Mr. Hauseman and Mr. Goldberg some money for

five lots were signed on the same day, written on standardized Portland Board of Realtor forms, and contained identical terms except for lot descriptions and purchase prices.[3] Each agreement provided that closing was to occur 10 days after issuance of a Washington County occupancy permit and that time was of the essence. Notwithstanding these provisions and the fact that occupancy permits were issued for lots 24 and 26 on July 11, 1978, and for lot 25 on July 17, 1978, the parties orally agreed to close on August 3, 1978.

On August 2, 1978, plaintiff William Walker submitted escrow instructions, signed the sale contracts and then left town. On the day set for closing, defendants deposited their funds in escrow but inserted an additional instruction which specified a "walk through" inspection of the units with plaintiffs and directed the escrow company to withhold release of the funds until defendants directed otherwise. The additional instruction was expressly "subject to the approval and agreement of the seller." On August 7, 1978, William Walker returned to town and discovered the escrow company would not release the funds. He immediately voided his escrow instructions and wrote Goldberg, Hauseman and defendants that because of the failure to complete the transaction "within the time specified in the Earnest Money Agreement" (that is, within 10 days of the issuance of the occupancy permits), he was withdrawing his offer to sell the lots.

Defendant Warrington learned of the escrow company's refusal to close in a telephone conversation with William Walker[4] and immediately gave the company written instructions to release the funds for closing. Walker refused to go ahead with the closing.[5] However, after a

---

that purpose. They claimed that they hadn't been paid their commissions or anything, the realtors."

However, how plaintiffs "saw" the transaction has no impact on its legal status.

[3] Defendants' earnest money agreements for the purchase of lots 22 and 23 were with Goldberg and Hauseman and not with plaintiffs. Goldberg and Hauseman had apparently signed earlier earnest money agreements with plaintiffs.

[4] He had assumed that plaintiffs had agreed to the walk- through instruction and that closing had occurred on August 3, 1978.

[5] Warrington testified that in the telephone conversation Walker said:

discussion with his attorney, Walker permitted closure on lots 22 and 23 on August 29, because, in his words, "Mr. Hauseman and Mr. Goldberg had not refused to close. They were caught in the middle. I felt sorry for them."

Defendants subsequently recorded their earnest money agreements for lots 24, 25 and 26. Plaintiffs brought suit to clear their title, and defendants counterclaimed for specific performance of the earnest money agreements and contracts of sale on lots 24, 25 and 26. The trial court found that:

> "* * * [T]ime was not of the essence and that plaintiff Walker by exercising the closing on lots 22 and 23 revives the whole transaction. All five lots were handled as a package deal and action on one is action on all.

> "It should be noted that defendant Warrington has relied heavily on the acquisition of all five lots. Loss of lots 24, 25 and 26 will place his whole program in jeopardy."

■ A time limit in any contract can be waived by the parties either expressly or impliedly. *Widing et al v. Jensen, Real estate Com.,* 231 Or 541, 547, 373 P2d 661 (1962); *Spaulding v. McCaige, et al,* 47 Or App 129, 134, 614 P2d 594 (1980). The rule with regard to waiver of a time is of the essence clause in a land sales contract is that:

> "* * * [A]ll the terms of the contract are binding upon all the parties thereto and that if the vendor, for whose benefit the stipulation about time being of the essence of the contract is made, would insist upon it, he must act promptly upon that provision so that any indulgence upon his part will amount to a nullification of that feature of the covenant. In effect, by operation of law upon his indulgence, a new contract is brought into existence for the time being, from which that clause is absent, and it so remains in this modified form until by reasonable notice to the opposite party that it will thereafter be insisted upon, the agreement between the parties is restored to its original form. * * *"

*Johnson et al v. Berns et al,* 111 Or 165, 173, 209 P 94, 224 P 624, 225 P 727 (1924); *see also, Peck v. Security Bank of*

---

"I have got you by the balls * * *. There is no way you are going to do your condo project when I have got three right in the center of the project that I am backing out on, and you gave me the opportunity and I am going to take it."

*Oregon,* 276 Or 61, 67, 554 P2d 505 (1976); *Pittman v. Thompson,* 45 Or App 627, 608 P2d 1223 (1980).

■ That is the rule with respect to a contract where a sequence of similar performances is due, and we believe an analogous rule should apply here where similar performances are due at a single time. That is, seller's toleration of late performance in a land sales contract operates as a waiver of the timely performance requirement for subsequent performances (unless otherwise expressly reinstated or unless the contract provides against an implied waiver); similarly, toleration of purchaser's late performance in one contract in a "package" of contracts should be construed as a waiver of the purchaser's timely performance with respect to the entire package.

■ Here there was ample evidence that the sale of all five lots was a "package deal." By dealing directly with defendants with respect to all five lots, making the same escrow closing arrangements for all five and calling defendants' additional closing instruction a breach of the time of the essence clause as to all five contracts, plaintiffs treated the contracts as a package.

Plaintiffs maintain they closed on lots 22 and 23 because "innocent parties" (Hauseman and Goldberg) would otherwise have been harmed. They also contend that defendants' last minute walk-through escrow instruction was an attempt to stall "to get them a little extra free ride on the seller's money." Apparently plaintiffs' refusal to close on the remaining lots was to punish defendants for what plaintiffs perceived as "game playing."

However, plaintiffs' *reasons* for waiving or not waiving the time of the essence clause are irrelevant to the question of *whether* time was still of the essence. Either time was of the essence, or it was not. Whether defendants' delay in closing was in bad faith and whether defendants were assignees does not decide the question. By closing on lots 22 and 23 some 26 days after the agreed-upon closing date, plaintiffs demonstrated that time was not of the essence with respect not only to those lots but to all of the lots in the package.[6] They cannot be allowed to assert a lack

---

[6] No one claims that the agreement to close on August 3, instead of 10 days after the issuance of the occupancy permits, waived the time of the essence clause.

of timely performance as a ground for forfeiture when in fact the grounds were unrelated to timely performance.

Affirmed.